UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GINIKA DIKE, <br><br>             Plaintiff, <br><br>     v. <br><br> ZARA USA, INC., <br><br>             Defendant. | Case No. 23-cv-00342-WHO <br><br> **ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAYING NON-INDIVIDUAL PAGA CLAIM** <br><br> Re: Dkt. No. 18 |

Defendant Zara USA, Inc. ("Zara"), an apparel company, moves to compel arbitration of individual claims brought by one of its former sales assistants, plaintiff Ginika Dike, who alleges that Zara violated California law when it failed to pay non-exempt workers for the time they spent screening for COVID-19 before beginning their shifts. Zara also moves to dismiss Dike's class and representative claims.

The motion is GRANTED, except for Dike's non-individual claim brought under California's Private Attorneys General Act ("PAGA"), which is not subject to arbitration and is STAYED until further guidance from the California Supreme Court. Dike's other claims must be arbitrated. Although the Arbitration Agreement ("Agreement") was a contract of adhesion, that alone does not render it procedurally unconscionable. Given the circumstances under which Dike signed the Agreement, and the language of the Agreement itself, any oppression or surprise was moderate at most. And she has made no showing of substantive unconscionability; the Agreement mutually binds the parties to arbitration and the PAGA waiver is not wholesale. Even if it were, the unenforceable portion could be severed and Dike's individual claim compelled to arbitration.

## BACKGROUND

Dike, who worked from Zara from approximately November 2018 to March 2022, alleges

that she and other Zara non-exempt employees were required to screen for COVID-19 by answering a series of questions on a computer and taking their temperatures before starting their shifts. First Am. Compl. ("FAC") [Dkt. No. 14] ¶¶ 7, 30-32. The FAC alleges that these screenings "could take several minutes," and that when employees clocked in for their shifts, they "were instructed not to include the time spent on pre-shift COVID-19 screening." *Id*. ¶¶ 33-35. The FAC further alleges that these employees were not paid for this time. *Id*. ¶ 30.

Dike sued Zara in state court on December 16, 2022, alleging various violations of California law. Dkt. No. 1-2. Zara removed the case to this court on January 23, 2023, 30 days after it was served. Dkt. No. 1. Dike then filed the FAC, which alleges five claims: failure to pay wages and compensation; failure to provide accurate wage statements; failure to pay wages upon separation of employment; violations of California's Unfair Competition Law ("UCL"); and for remedies under PAGA. *See* Dkt. No. 14. Each claim is brought on behalf of Dike and the class. *See id*.

In March 2023, Zara moved to compel arbitration of Dike's individual claims and to dismiss the class claims and representative PAGA claim. Dkt. No. 18. According to Zara, on March 22, 2019, the day that it hired Dike as a sales associate, she signed a "Mutual Dispute Resolution Agreement" ("the Agreement"). Mot. [Dkt. No. 18] 3:8-10 (citing Dmytryszyn Decl., Ex. A).[1] The relevant terms of the Agreement include:

> **3. Covered Claims:** You and the Company agree that any controversy, dispute, or claim that could otherwise be raised in court ("Covered Claim") that the Company has against You or You have against the Company . . . must be resolved by binding arbitration and not in court. Covered Claims, by way of example only, include claims for wages and other compensation, breach of contract, theft of trade secrets or unfair competition, violation of public policy, wrongful termination; tort claims; claims for unlawful retaliation, discrimination and/or harassment; and claims for violation of any federal state, or other government law, statute, regulation, or ordinance. . . .
>
> **4. Claims Not Covered:** . . . To the extent federal law prohibits enforcement of Section 5 with respect to representative claims under California's Private Attorneys

---

[1] According to a declaration from Dike, she went on leave shortly after she was hired by Zara in November 2018. Oppo. [Dkt. No. 19] Dike Decl. ¶ 3. She returned from leave in March 2019 and signed the Agreement "[a]t some point soon after." *Id*.

2

> General Act of 2004, California Labor Code §§ 2698, *et seq.* and representative claims for public injunctive relief under California Business and Professions Code § 17203, such claims also are not covered by this Agreement. . . .
>
> **5. Individual Claims Only:** Covered Claims must be brought on an individual basis only, and arbitration on an individual basis is the exclusive remedy. Neither party may submit a multi-plaintiff, class, collective, or representative action for resolution under this Agreement, and no arbitrator has authority to proceed with arbitration on such a basis or to consolidate claims. Any disputes concerning the applicability or validity of this multi-plaintiff, class, collective, and representative action waiver will be decided by a court of competent jurisdiction, not by the arbitrator. In the event a court determines that this Section 5 is unenforceable with respect to any claim, it shall not apply to that claim, and that claim may then only proceed in court as the exclusive forum. . . .

Dmytryszyn Decl., Ex. A ("Agreement") §§ 3-5.

The last page of the Agreement is titled "Acknowledgement of Receipt and Agreement to be Bound," which states:

> I acknowledge that I have received and read Zara USA, INC's ("the "Company") September 2018 Mutual Dispute Resolution Agreement ("Agreement"). By signing below, I affirm that I understand the Agreement's terms and that by accepting new employment with the Company or by continuing employment after its effective date, I knowingly and freely enter into this Agreement and agree to be bound by it.
>
> **I UNDERSTAND THAT THE MUTUAL DISPUTE RESOLUTION AGREEMENT IS A CONTRACT. THIS CONTRACT IS A BINDING ARBITRATION AGREEMENT WHICH MAY BE ENFORCED BY THE PARTIES. BY SIGNING BELOW, I ACKNOWLEDGE THAT I HAVE RECEIVED AND READ OR HAVE HAD THE OPPORTUNITY TO READ THIS ARBITRATION AGREEMENT. I UNDERSTAND THAT THIS ARBITRATION AGREEMENT REQUIRES THAT DISPUTES THAT INVOLVE THE MATTERS SUBJECT TO THE AGREEMENT BE SUBMITTED TO ARBITRATION PURSUANT TO THE ARBITRATION AGREEMENT RATHER THAN TO A JUDGE AND JURY IN COURT.**

*Id*. at 3. Dike's name and signature appear directly below this attestation. *Id*.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs motions to compel arbitration. 9 U.S.C. §§ 1 *et seq*. In deciding whether to compel arbitration, the court must consider two "gateway issues": (1) whether there is a valid agreement to arbitrate between the parties, and if so (2) whether the agreement encompasses the dispute. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir.

2015) (citation omitted).  "In determining whether a valid arbitration agreement exists, federal courts apply ordinary state-law principles that govern the formation of contracts." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citation and quotations omitted).  If the court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

## DISCUSSION

Dike does not dispute that she signed the Agreement, or that it contains arbitration provisions. *See* Oppo. at 1:2-14, 2:10-12.  Instead, she contends that the Agreement is unconscionable and thus unenforceable. *Id*. at 1:12-13.  She further argues that unconscionable provisions so permeate the Agreement that they cannot be severed. *Id*. at 17:3-22.

"It is well-established that unconscionability is a generally applicable contract defense, which may render an arbitration provision unenforceable." *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1280 (9th Cir. 2006).  Under California law, a provision is unenforceable if it is both procedurally and substantively unconscionable. *See id*.  Procedural unconscionability focuses on "oppression or surprise that results from unequal bargaining power," while substantive unconscionability considers "overly harsh or one-sided results." *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1033 (N.D. Cal. 2022) (citations omitted).  Although both procedural and substantive unconscionability must be present for a court to deem a contract provision unenforceable, "they need not be present in the same degree." *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 910 (2015) (citation omitted).  Instead, they "operate on a sliding scale: the lesser the procedural unconscionability, the greater substantive unconscionability must be shown, and vice versa." *MacClelland*, 609 F. Supp. 3d at 1033 (same).

### I.   PROCEDURAL UNCONSCIONABILITY

"Procedural unconscionability concerns the manner in which the contract was negotiated and the respective circumstances of the parties at that time, focusing on the level of oppression and

4

surprise involved in the agreement." *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th Cir. 2013) (citations omitted). "Oppression addresses the weaker party's absence of choice and unequal bargaining power that results in no real negotiation." *Id*. (citation and quotations omitted). "Surprise involves the extent to which the contract clearly discloses its terms as well as the reasonable expectations of the weaker party." *Id*. (citation omitted). The party asserting unconscionability bears the burden of proving it. *OTO, LLC v. Kho*, 8 Cal. 5th 111, 126 (2019) (citations omitted).

Dike argues that the Agreement is procedurally unconscionable for three reasons. First, she contends that it is per se oppressive because it was a condition of her employment and thus a contract of adhesion. Oppo. at 4:18-5:25. Next, she argues the Agreement was oppressive because she was not given adequate time to review it, it was not explained to her, and she was pressured to sign it. *Id*. at 5:26-7:10. Finally, she contends that the Agreement was surprising because it was a "byzantine, three-page agreement with references to carve outs and exceptions in other sections," and referenced without explanation the rules and regulations that would govern any arbitration. *Id*. at 7:11-10:9.

### A. Adhesion

Under California law, "oppression may be established by showing the contract was one of adhesion." *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1260 (9th Cir. 2017) (citation omitted). A term or contract of adhesion indicates a standardized provision or agreement "which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Id*. at 1260-61 (same). While "the adhesive nature of the contract is sufficient to establish some degree of procedural unconscionability in a range of circumstances, the California Supreme Court has not adopted a rule that an adhesion contract is per se unconscionable." *Id*. at 1261 (citations and quotations omitted). Specifically, the Ninth Circuit has stated that under California law, "if an employee must sign a non-negotiable employment agreement as a condition of employment but there is no other indication of oppression or surprise, then the agreement will be enforceable unless the degree of substantive unconscionability is high." *Id*. (same).

5

Zara does not appear to dispute that the Agreement was a condition of Dike's employment and thus a contract of adhesion. *See* Reply [Dkt. No. 20] 7:15-8:5. Indeed, the plain language of the Agreement states that "by accepting employment or working on or after September 1, 2018, You and the Company both waive the right to a judge or jury trial in court." Agreement § 2. It further states that "[b]y accepting new employment with the Company or by continuing employment after its effective date, I knowingly and freely enter into this Agreement and agree to be bound by it." *Id*. at 3. Zara argues that "a contract of adhesion does not evidence a high level of procedural unconscionability absent some additional evidence of 'oppression,' 'sharp practice,' or 'unfair surprise.'" Reply at 8:2-5.

On its own, any adhesive nature of the Agreement does not determine whether the Agreement is unconscionable. Other indications of oppression or surprise, or a high degree of substantive unconscionability, are required before a contract of adhesion is unenforceable. *See Poublon*, 846 F.3d at 1261.

### B. Oppression

To determine oppression, courts consider circumstances including:

> (1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's review of the proposed contract was aided by an attorney.

*OTO*, 8 Cal. 5th at 126-27 (citation omitted). One of these factors clearly cuts in Dike's favor: She was not aided by an attorney in any review of the Agreement. *See* Oppo., Dike Decl. ¶ 7.

Others are less clear. Dike attests that the "entire process of reviewing and signing the documents did not take long," and that "when I was given the documents, I was told to sign them and return them immediately so that we could move forward with the onboarding process." *Id*. ¶¶ 5-6. However, Dike does not provide an estimate of how long this process took—whether it was "a few minutes" or longer. *See id*., *see also Wherry v. Award, Inc.*, 192 Cal. App. 4th 1242, 1247 (2011) (finding oppression when the plaintiffs "were given but a few minutes to review and sign" the agreement "without any time to ask questions"). And although Dike's motion describes her as

an "entry-level sales associate" and implies that she was not a "sophisticated employee," she proffers no evidence of her education and experience that is helpful in my analysis. *See* Oppo. at 6:28-7:1; *see also id.*, Dike Decl. ¶¶ 3, 7.

Dike says that "[t]he amount and type of pressure exerted on [her] to sign was also high" because she signed the documents inside a store breakroom at the instruction of a "Zara hiring/recruitment representative" who told her "when and where to sign." Oppo. at 6:18-19; Dike Decl. ¶ 4. Dike attests that out of a stack of approximately 20 pages of documents and a 20-page employee handbook, the Zara representative only explained documents relating to Dike's hourly salary and that "[m]ost of the time was spent discussing [her] hourly salary and related documents." Oppo., Dike Decl. ¶ 4. Dike further states that she followed the representative's directions, "signed the documents when instructed," and "was not given the time or opportunity to ask questions about the other documents." *Id.* ¶ 5.

Dike analogizes her situation to that described in *OTO*, where the California Supreme Court determined there was oppression when the employer "conveyed an expectation that" an employee sign documents "immediately, without examination or consultation with counsel." *See* Oppo. at 6:20-22 (citing *OTO*, 8 Cal. 5th at 127). But *OTO* is distinguishable. There, a "low-level employee, a 'porter'" presented an agreement to the employee in his workspace and waited for him to sign the documents before leaving, which the court found conveyed the aforementioned expectation. *See OTO*, 8 Cal. 5th at 127. Although the employer argued that the employee "did not ask questions about the agreement," the court found that there was "no indication that the porter had the knowledge or authority to explain its terms." *Id.*

Although Dike was also given the Agreement at her workplace, it was in a store breakroom as part of her onboarding process, not at a workstation where she performed her job. *See id.* at 118 (stating that the porter approached the employee "in his workstation and asked him to sign several documents"); *see also* Oppo., Dike Decl. ¶ 3. The Zara employee who presented the Agreement to Dike was a "hiring/recruitment representative" who, unlike the low-level porter in *OTO*, could have answered Dike's questions. Indeed, that representative *did* explain some of the documents relating to Dike's salary—Dike acknowledges that there was time spent discussing that topic. *See*

7

Oppo., Dike Decl. ¶ 4. Dike states that she was not given the time or opportunity to ask questions about other documents, but does not state that her attempts to do so were unsuccessful. *See id*. ¶ 5. Based on the discussion about her salary and related documents, it seems that she would have had the opportunity to at least ask questions about other documents or topics, particularly when a "hiring/recruitment representative" was available to answer them. Moreover, Zara proffers a declaration from a human resources employee (the "Head of HR West") who states that when employees are given their onboarding documents, they are "given the opportunity to review the Mutual Dispute Resolution Agreement and ask questions" before signing it in a hard copy. *See* Mot., Dmytryszyn Decl. ¶¶ 1, 4.

Moreover, although Dike attests that she "followed the Zara representative's directions and signed the documents when instructed" but "was not aware of the content" of documents beyond those relating to her hourly salary, "[a]n arbitration clause within a contract may be binding on a party even if the party never actually read the clause." *See* Oppo., Dike Decl. ¶¶ 4-5; *see also Pinnacle Museum Tower Ass'n v. Pinnacle Market Dev. (U.S.), LLC*, 55 Cal. 4th 223, 236 (2012) (citation omitted); *Norcia v. Samsung Telecomm. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) ("A party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing.") (same).

Finally, Dike argues that "the arbitration policy itself is comprised of three pages of prolixity, with references to legal terminology and arbitration rules that would seem impenetrable to even a sophisticated employee." Oppo. at 6:26-7:2. Again, the case she relies upon is distinguishable. *Higgins v. Superior Ct.*, 140 Cal. App. 4th 1238, 1252-53 (2006), involved "young and unsophisticated" parties between the ages of 14 and 21 who signed an agreement with an arbitration provision buried among 12 "miscellaneous" paragraphs with no highlighted, bold, capitalized, or large font setting it apart. Dike, who is over the age of 18, signed a two-and-a-half-page agreement that was separate from the other documents, described itself as an "agreement" or "arbitration agreement," and explained at the start that, "'Arbitration' is a legal process by which a neutral third-party, not employed by the Company, makes a binding decision relating to a dispute." *See* Oppo., Dike Decl. ¶ 1; Agreement ¶ 1. Importantly, at the end of the Agreement, a

8

paragraph states in bold, capitalized letters set apart from the rest of the provisions:

> **I UNDERSTAND THAT THE MUTUAL DISPUTE RESOLUTION AGREEMENT IS A CONTRACT. THIS CONTRACT IS A BINDING ARBITRATION AGREEMENT WHICH MAY BE ENFORCED BY THE PARTIES. BY SIGNING BELOW, I ACKNOWLEDGE THAT I HAVE RECEIVED AND READ OR HAVE HAD THE OPPORTUNITY TO READ THIS ARBITRATION AGREEMENT. I UNDERSTAND THAT THIS ARBITRATION AGREEMENT REQUIRES THAT DISPUTES THAT INVOLVE THE MATTERS SUBJECT TO THE AGREEMENT BE SUBMITTED TO ARBITRATION PURSUANT TO THE ARBITRATION AGREEMENT RATHER THAN TO A JUDGE AND JURY IN COURT.**

Agreement at 3. Dike's name and signature appears underneath. *Id.* Even if the rest of the Agreement contained prolix language or legalese, this section would have been seen by Dike and is clear: Any disputes covered by the Agreement will not go to a judge or jury, but instead to arbitration.

Taking these factors into account, any oppression is minimal at best and undercuts Dike's argument about procedural unconscionability.

### C. Surprise

Surprise occurs when "the allegedly unconscionable provision is hidden within a prolix printed form." *Pinnacle Museum*, 55 Cal. 4th at 247 (citation omitted). "An agreement may thwart understanding by hiding the challenged provision, or by using language—for example, complex statements filled with legal jargon—rendering the substance of the challenged provision opaque." *Long Beach Unified Sch. Dist. v. Margaret Williams, LLC*, 43 Cal. App. 5th 87, 104 (2019).

Some of Dike's arguments about oppression carry over here. She again argues that the Agreement "is presented in such a way that its terms would amount to surprise to all but the most sophisticated employees, much less plaintiff, who was hired as an entry-level sales associate." Oppo. at 8:6-8. She describes the Agreement as a "byzantine, three-page agreement with references to carve outs and exceptions in other sections, some of which are contingent upon judicial review, such that its terms are so hidden or unexpected that a party cannot have had adequate notice." *Id.* at 8:9-11. She argues that the Agreement is also unconscionable "because it

1  references rules and regulations that govern the arbitration, but does not explain the applicable
2  rules, attach them, or provide a reasonabl[e] means for employees to view them at the time that the
3  agreement is executed." *Id*. at 9:1-3.

4        While the Arbitration Agreement was presented with an estimated 40 pages of documents,
5  it is a standalone, two-and-a-half page document identified as a "Mutual Dispute Resolution
6  Agreement" that appears to be printed in a standard-size font. *See id*., Dike Decl. ¶ 4; *see*
7  *generally* Agreement.  Each of its seven paragraphs is clearly labeled in bold, underlined font,
8  alerting the reader to sections such as "Covered Claims," "Claims Not Covered," "Individual
9  Claims Only," and "Procedures."  *See generally* Agreement.  This is a far cry from a "particularly
10 inconspicuous" arbitration clause "printed in eight-point typeface on the opposite site of the
11 signature page" of a contract, which Dike points to in asserting that the Agreement's "terms are so
12 hidden or unexpected that a party cannot have had adequate notice." *See* Oppo. at 8:8-12 (citing
13 *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 77, 89 (2003)).

14       The Agreement contains provisions carving out certain claims.  Sections 4 and 5 explain
15 that certain claims are not covered.  *See* Agreement ¶¶ 4-5.  Dike takes particular issue with
16 language in these provisions that discusses section 5, stating that "[t]o the extent federal law
17 prohibits enforcement of section 5 with respect to representative claims" under PAGA and the
18 California Labor Code "such claims are also not covered by this Agreement," and that "[i]n the
19 event a court determines that this section 5 is unenforceable with respect to any claim, it shall not
20 apply to that claim." *See* Oppo. at 8:21-28; Agreement ¶¶ 4-5.  Although this includes some legal
21 jargon, other language in the Agreement can be clearly understood by a lay person.  As explained
22 above, the Agreement defines "arbitration" at the beginning. *See* Agreement ¶ 1.  It also states
23 that "[i]f any disputes cannot be resolved informally, the Company and each of its employees
24 agree to use the mediation and arbitration procedures in this [Agreement] *instead of a trial in*
25 *court before a judge or jury*." *Id*. (emphasis added).  And at the end, right above Dike's name and
26 signature, the Agreement states that the signatory "**UNDERSTAND[S] THAT THIS**
27 **ARBITRATION AGREEMENT REQUIRES THAT DISPUTES THAT INVOLVE THE**
28 **MATTERS SUBJECT TO THE AGREEMENT BE SUBMITTED TO ARBITRATION**

10

1   **PURSUANT TO THE ARBITRATION AGREEMENT *RATHER THAN TO A JUDGE AND*
2   *JURY IN COURT.*"** *Id*. at 3 (emphasis added).  Even if it were not immediately apparent to Dike
3   which of her claims may be subject to arbitration, the Agreement's plain language makes clear that
4   disputes would be handled via arbitration without a judge or jury.  One does not need specialized
5   legal training to understand the phrases "instead of a trial in court before a judge or jury" or
6   "rather than to a judge and jury in court."  *See id*. ¶ 1, 3.

7   Finally, the California Supreme Court has rejected the argument that an employer's failure
8   to provide an employee with a copy of the American Arbitration Association ("AAA") rules
9   referenced within an arbitration agreement was automatically a sign of unconscionability—and
10  thus narrowed the scope of the case that Dike relies upon.  *See* Oppo. at 9:16-10:2 (citing *Harper
11  v. Ultimo*, 113 Cal. App. 4th 1405-07 (2003)).  In *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237,
12  1246 (2016), the court noted that in *Harper* and other cases, the "unconscionability claim
13  depended in some manner on the arbitration rules in question," meaning that the cases "stand for
14  the proposition that courts will more closely scrutinize the substantive unconscionability of terms
15  that were 'artfully hidden' by the simple expedient of incorporating them by reference rather than
16  including them in or attaching them to the arbitration agreement."  As in *Baltazar*, Dike's
17  argument does not "concern[] some element of the AAA rules of which she had been unaware
18  when she signed the arbitration agreement."  *See id*. at 1246.  Zara's failure to attach those rules
19  does not affect my consideration of her claims of unconscionability.  *See id*.

20  In sum, although the Agreement is a term of adhesion, Dike has shown only minimal
21  oppression and surprise.  Any procedural unconscionability is moderate at most.

22  **II.     SUBSTANTIVE UNCONSCIONABILITY**

23  "A contract is substantively unconscionable when it is unjustifiably one-sided to such an
24  extent that it shocks the conscience."  *Chavarria*, 733 F.3d at 923 (citation and quotations
25  omitted).  Dike argues that the Agreement is substantively unconscionable because it lacks
26  mutuality and includes an unlawful PAGA waiver.  Oppo. at 10:21-12:27.

27  **A.  Mutuality**

28  In the context of an arbitration agreement between an employer and an employee, "the

1  doctrine of unconscionability limits the extent to which a stronger party may, through a contract of
2  adhesion, impose the arbitration forum on the weaker party without accepting that forum for
3  itself." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 118 (2000).  An
4  agreement lacks mutuality "if it requires one contracting party, but not the other, to arbitrate all
5  claims arising out of the same transaction or occurrence or series of transactions or occurrences."
6  *Id*. at 120.

7  According to Dike, the Agreement "appears to emphasize its application to claims that
8  employees bring to employers, but not to claims employers bring to employees." Oppo. at 10:23-
9  24.  She points to section 3, which lists the claims subject to arbitration:

> **3. Covered Claims:** You and the Company agree that any controversy, dispute, or claim that could otherwise be raised in court ("Covered Claim") that the Company has against You or You have against the Company . . . must be resolved by binding arbitration and not in court.  Covered Claims, by way of example only, include claims for wages and other compensation, breach of contract, theft of trade secrets or unfair competition, violation of public policy, wrongful termination; tort claims; claims for unlawful retaliation, discrimination and/or harassment; and claims for violations of any federal, state, or other government law, statute, regulation, or ordinance. . . .

Agreement ¶ 3.  Dike contends that these claims "are most realistically brought by employees against their employers," as would class claims waived under section 5.  *See id*. at 11:8-17.

Zara responds that the claims covered by the Agreement include those "that are generally alleged by an employer" rather than an employee, pointing to claims of breach of contract, theft of trade secrets, or unfair competition.  Reply at 14:6-11.  Zara further argues that the Agreement "is expressly mutual," as it states that any claim "that the Company has against You or You have against the Company . . . must be resolved by binding arbitration and not in court." *See id*. at 14:3-6, 28 (citing Agreement ¶ 3).

I agree with Zara.  The Agreement is facially mutual and requires both parties to arbitrate certain claims.  *See* Agreement ¶ 3.  The list of claims includes (but is not limited to) claims that would typically be brought by an employer, including claims for "breach of contract, theft of trade secrets or unfair competition."  *Id*.  It is also plausible that Zara might bring a tort claim or claims for violations of other laws, which are also covered by the Agreement.  *See id*.

Moreover, the California Supreme Court has stated that provisions are not "unfairly one-sided merely because one side is, as a practical matter, more likely to make use of it." *Baltazar*, 62 Cal. 4th at 1248 n.4. Although the court considered this in the context of provisional injunctive relief, the same logic applies here. *See id*. at 1247. And like the agreement in *Baltazar*, this Agreement "clearly covers claims an employer might bring as well as those an employee might bring" and the list of enumerated claims uses language ("by way of example only") that makes clear "that the list is not intended to be exhaustive." *See id*. at 1249. These examples "do not alter the substantive scope of the agreement, nor do they render the agreement sufficiently unfair as to make its enforcement unconscionable." *See id*. Mutuality is no issue.

### B.  PAGA Waiver

Finally, Dike argues that the Agreement is substantively unconscionable because it "includes an unlawful PAGA waiver that is unenforceable." Oppo. at 11:23-24. Relying primarily on a line of cases that predates the Supreme Court's decision in *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022), she argues that: (1) the PAGA waiver within the Agreement is an invalid "wholesale waiver"; (2) the waiver is thus unenforceable; and (3) Dike's PAGA claim must proceed in court rather than arbitration. *See id*. at 11:21-16:26.

A brief overview of both PAGA and *Viking River* is needed. "PAGA allows an aggrieved employee to seek civil penalties for Labor Code violations committed against her and other aggrieved employees by bringing, on behalf of California, a representative action against her employer." *Valencia v. Mattress Firm, Inc.*, No. C-22-06875-WHA, 2023 WL 2062951, at *3 (N.D. Cal. Feb. 16, 2023) (citing Cal. Lab. Code § 2699). In *Viking River*, the Supreme Court determined that PAGA claims are "representative" in two ways. *See* 142 S. Ct. at 1916. First, the Court wrote, PAGA claims are always representative in the sense that they are brought by employees acting as representatives (i.e., agents or proxies) of the state. *Id*. Second, PAGA claims are also "representative" when "predicated on code violations sustained by other employees." *Id*. Regarding the latter, the Court wrote, "it makes sense to distinguish 'individual' PAGA claims, which are premised on Labor Code violations actually sustained by the plaintiff, from 'representative' (or perhaps quasi-representative) PAGA claims arising out of events

involving other employees." *Id*.

The Supreme Court then held that the FAA preempts a rule established by the California Supreme Court in *Iskanian v. CLA Transportation Los Angeles, LLC*, 59 Cal. 4th 348 (2014) that precluded dividing PAGA actions into individual and non-individual claims. *Id*. at 1924. The Court further held that a "wholesale waiver" of a PAGA claim in an arbitration agreement remained invalid, but because the agreement at issue included a severability clause, the agreement was enforceable as to the individual PAGA claim. *See id*. at 1924-25.

As a threshold matter, Dike argues that *Viking River* does not apply because "whether a contract is unconscionable is made based on the circumstances at the time the agreement was made," and at the time she signed the Agreement in 2019, *Iskanian* controlled, not *Viking River*. *See* Oppo. at 12:17-24. If this were true, the Supreme Court would not have reversed the lower court's ruling and held that the individual PAGA claim was subject to arbitration and the "correct course' was to dismiss the remaining non-individual claim. *See Viking River*, 142 S. Ct. at 1925. Nor would courts have applied *Viking River* to arbitration agreements signed before it was decided. *See, e.g., Martinez-Gonzalez v. Elkhorn Packing Co., LLC*, No. 18-CV-05226-EMC, --- F. Supp. 3d ----, 2022 WL 10585178, at *2, 11-12 (N.D. Cal. Oct. 18, 2022) (applying *Viking River* to arbitration agreements signed in 2016 and 2017); *Shams v. Revature LLC*, No. 22-CV-01745-NC, --- F. Supp. 3d ----, 2022 WL 3453068, at *1-2 (N.D. Cal. Aug. 17, 2022) (applying *Viking River* to an arbitration agreement signed in 2021).

Dike argues that even under *Viking River*, the PAGA waiver is wholesale and remains invalid. Oppo. at 13:24-14:7. The following language is at issue:

> **5. Individual Claims Only:** Covered Claims must be brought on an individual basis only, and arbitration on an individual basis is the exclusive remedy. *Neither party may submit a multi-plaintiff, class, collective, or representative action for resolution under this Agreement*, and no arbitrator has authority to proceed with arbitration on such a basis or to consolidate claims. Any disputes concerning the applicability or validity of this multi-plaintiff, class, collective, and representative action waiver will be decided by a court of competent jurisdiction, not by the arbitrator. In the event a court determines that this section 5 is unenforceable with respect to any claim, it shall not apply to that claim, and that claim may then only proceed in court as the exclusive forum. . . .

14

1    Agreement § 5 (emphasis added).  According to Dike, a plain reading of this language shows that
2    the Agreement "seeks to waive any representative action, without limitation or specification
3    regarding plaintiff's right or representative standing to bring claims on behalf of herself or as a
4    proxy of the state."  Oppo. at 14:4-7.

5    Although the sentence at issue prohibits the parties from bringing "a multi-plaintiff, class,
6    collective, or representative action," the accompanying language makes clear that Dike can bring
7    the individual portion of her PAGA claim.  *See* Agreement § 5.  The preceding sentence clarifies
8    that "Covered Claims must be brought *on an individual basis only*, and arbitration *on an*
9    *individual basis* is the exclusive remedy."  *See id.* (emphasis added).  This is reinforced by the
10   section's label: "Individual Claims Only."  *See id.*

11   Courts within this District have found similar language cuts against a finding of a
12   wholesale waiver.  In *Valencia*, for example, the Hon. William Alsup determined that a waiver of
13   "any right to bring claims as class, collective, or representative actions" referred to non-individual
14   or class claims rather than individual PAGA claims because of the immediately preceding
15   sentence: "All claims covered by this Agreement are intended to be brought and resolved on an
16   individual basis."  *See* 2023 WL 2062951, at *3.  Similarly, in *Shams*, the Hon. Nathanael M.
17   Cousins found that a waiver of the parties' "rights to pursue class action, collective action,
18   multiple-party, and private attorney general remedies in any court and in any arbitration forum"
19   was not a wholesale waiver for two reasons.  *See* 2022 WL 3453068, at *2.  First, the term
20   "private attorney general" was grouped with the waiver of rights to pursue class action, collective
21   action, and multiple-party remedies.  *See id.*  Second, the last sentence in the clause at issue stated
22   that "each party shall only submit their own individual claims in arbitration and shall not bring
23   claims against the other in any representative capacity on behalf of any other individual."  *See id.*
24   Judge Cousins wrote that "[f]rom this context, it is clear that the agreement's PAGA waiver is a
25   waiver of [the plaintiff's] right to bring non-individual claims; it is not a wholesale waiver."  *Id.*

26   The context of this Agreement reveals the same: the PAGA waiver only waives Dike's
27   ability to bring non-individual PAGA claims, not individual ones.  It is not a wholesale waiver.
28   Dike's individual PAGA claim must be arbitrated.

1    Even if it were a wholesale waiver that was invalid, the Agreement contains severability
2    language that would apply.  Section 5 provides that, "[i]n the event a court determines that this
3    section 5 is unenforceable with respect to any claim, it shall not apply to that claim, and that claim
4    may then only proceed in court as the exclusive forum."  Agreement § 5.  In addition, section 7
5    states that "[i]f any part of this Agreement is held to be invalid, void, or unenforceable, it shall be
6    severed and the remaining provisions of this Agreement shall remain in full force and effect."  *Id*.
7    § 7.  In *Viking River*, the Supreme Court held that the severability clause in the agreement at
8    issue—described as "if the waiver provision is invalid in some respect, any 'portion' of the waiver
9    that remains valid must still be 'enforced in arbitration'"—mandated arbitration of the individual
10   PAGA claim even if the waiver were interpreted as wholesale.  *See* 142 S. Ct. at 1924-25.

The same is true here.  Even if the PAGA waiver impeded Dike's ability to bring a representative claim, that claim could be severed under sections 5 and 7 and be heard in court.  *See Viking River*, 142 S. Ct. at 1924-25.  Dike's individual PAGA claim, however, remains subject to arbitration.

In sum, Dike has not shown that mutuality or the PAGA waiver render the Agreement substantively unconscionable, let alone to a high enough degree that slides the moderate amount of procedural unconscionably (if that) to a point where the Agreement is unconscionable.  The Agreement is enforceable.  Dike must arbitrate her individual claims against Zara.

The final question is what to do with Dike's non-individual PAGA claim.  In *Viking River*, the Supreme Court wrote that such claims "may not be dismissed simply because they are 'representative,'" but saw "no mechanism" in PAGA "to enable a court to adjudicate non-individual PAGA claims once an individual claim has been committed to a separate proceeding." 142 S. Ct. at 1925.  It determined that the plaintiff lacked statutory standing to maintain her non-individual claims in court and that "the correct course is to dismiss."  *Id*.

But as Justice Sotomayor noted in her concurrence, if the Supreme Court's "understanding of state law is wrong, California courts, in an appropriate case, will have the last word."  *Id*.  The California Supreme Court has done just that, taking up the issue of statutory standing in *Adolph v. Uber Technologies, Inc.*, No. G059860, 2022 WL 1073583 (Apr. 11, 2022)*, review granted* (July

16

20, 2022). Cases within this District have stayed, rather than dismiss, non-individual PAGA claims pending "further legal developments" or the California Supreme Court's decision in *Adolph*, which was just argued. *See, e.g., Martinez-Gonzalez*, 2022 WL 10585178, at *12; *Valencia*, 2023 WL 2062951, at *4; *Dominguez v. Sonesta Int'l Hotels Corp.*, No. 22-CV-03027-JCS, --- F. Supp. 3d ----, 2023 WL 25707, at *8 (N.D. Cal. Jan. 3, 2023). I will do the same.

## CONCLUSION

Zara's motion to compel arbitration is GRANTED, with the exception of Dike's non-individual PAGA claim, which is STAYED pending the California Supreme Court's decision in *Adolph*. The parties shall notify the court within 10 days of the state court's decision so that a Case Management Conference may be scheduled.

**IT IS SO ORDERED.**

Dated: May 10, 2023

William H. Orrick
United States District Judge

17